**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>IN RE:</td><td>:</td><td>CHAPTER 11</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Beth Israel Hospital Association of Passaic</td><td>:</td><td></td></tr>
<tr><td>d/b/a PBI Regional Medical Center,</td><td>:</td><td>CASE NO.:   06-16186 (NLW)</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td align="center">Debtor.</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

**FILED**
JAMES J. WALDRON, CLERK

July 12, 2007

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy

**Before:       HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Gerald H. Gline, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
PO Box 800
Hackensack, N.J. 07601
Attorneys for Debtor-in-Possession

Richard J. Zall, Esq.
Jeffrey W. Levitan, Esq.
Michael T. Mervis, Esq.
Proskauer Rose LLP
1585 Broadway
New York, N.Y. 10036-8299
Attorneys for Beth Israel Regional Acquisition Company, LLC

Hal L. Baume, Esq.
Fox Rothschild LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
Attorneys for Official Committee of Unsecured Creditors

Beth Israel Regional Acquisition Company, L.L.C. ("BIRAC") requests that this Court authorize and direct payment to it of a breakup fee in the amount of $900,000.00 as an administrative expense. BIRAC seeks this sum on the grounds that it was the _de facto_ "stalking horse" for the sale of the assets of Beth Israel Hospital Association of Passaic, d/b/a PBI Regional Medical Center ("Debtor") to St. Mary's Hospital ("St. Mary's").

In October, 2006 the Debtor entered into an asset purchase agreement with BIRAC ("BIRAC APA"), and in November, 2006 the Debtor filed a motion in which, _inter alia_, it asked that this Court approve BIRAC as the stalking horse bidder. Before that motion could be heard, the Debtor announced that it had reached an agreement to sell substantially all of its assets to St. Mary's. The Debtor thereupon withdrew its motion premised on the BIRAC APA, and filed a motion based on the asset purchase agreement with St. Mary's ("St. Mary's APA"). The Court approved the sale of assets to St. Mary's in December, 2006, and the closing occurred in late February, 2007.

BIRAC asserts that it is entitled to the $900,000.00 break-up fee agreed upon by the parties in the BIRAC APA because the facts demonstrate that:

> (i)   the Debtor had stated that the break-up fee was reasonable and recognized the value that BIRAC added to the sale transaction as a stalking horse bidder;
>
> (ii)  the Debtor used BIRAC as a catalyst to elicit an improved bid from St. Mary's; and
>
> (iii) the Debtor used BIRAC and the BIRAC APA to demonstrate that a going concern sale was likely, so that Commerce Bank would continue funding the Debtor's operations.

The Debtor argues that the facts do not support BIRAC's contention that the Debtor's negotiations with BIRAC and the execution of the BIRAC APA caused St. Mary's to renew its negotiations with the Debtor. Rather, the Debtor contends that BIRAC's renegotiation of certain terms of the APA caused delays that afforded St Mary's the opportunity to put forward an offer that was favored by

2

Commerce Bank, who would not support a sale to BIRAC.

As set forth at greater length below, after considering the papers and the arguments of counsel, the Court finds that BIRAC is not entitled to a break-up fee, or reimbursement of its expenses as an administrative expense under 11 U.S.C§ 503(b)(1)(A).

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).  The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.


## STATEMENT OF FACTS

### A.    Background

On July 10, 2006 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continued in possession of its property and management of its affairs as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  The Debtor is a New Jersey non-profit corporation that owned and operated a 264 bed acute care hospital in Passaic, New Jersey.

The Interim Chief Executive Officer, Henry Wells ("Wells") submitted an affidavit in support of the Debtor's "First Day Motions" that described the circumstances that caused the Debtor to file for Chapter 11 relief.  (Wells Affidavit [Docket # 11]).  He particularly pointed out that the Debtor had suffered a steady decline in the number of patients as a result of (i) many medical procedures being performed at outpatient ambulatory care facilities and/or in physicians' offices, (ii) the departure of certain key physicians, (iii) the reduction in admissions by other physicians, and (iv) the uncertainty in the community about the Debtor's future.  (Wells Aff. ¶ 27).  Wells

further observed that as a non-profit hospital, the Debtor is required to provide care regardless of the patient's the ability to pay. Consequently, although the State of New Jersey reimbursed the Debtor for a small portion of its expenses, the Debtor's obligation to provide uncompensated care while experiencing a declining volume of paying patients worsened the Debtor's financial condition. (Id. ¶ 28). Wells further pointed to the fact that in 2005, on total revenues of approximately $140 million, the Debtor sustained a loss of approximately $7.3 million, and through May, 2006 the Debtor experienced a loss of approximately $8.4 million against operating revenues of approximately $52.6 million. (Id. ¶ 11).

Additionally, Wells revealed that as early as December, 2005, the Debtor had engaged a firm to develop a process for soliciting offers for purchase of the hospital. (Id. at ¶ 24). He also stated that in its Chapter 11 case the Debtor expected to seek approval "for an expedited sale/transaction process to maximize interest and allow the Debtor to evaluate all of its options." (Id.). In fact, one week later the Debtor filed an application to retain Cain Brothers & Co., LLC ("Cain Brothers") as its investment banker in order to develop a sales process for the Debtor.

The pressing need for quick action by the Debtor to effect a sale or similar transaction was underscored by counsel for Commerce Bank during the July 12, 2006 hearing on the Debtor's motion for interim use of cash collateral. Bank counsel disclosed that approximately one month prior to the Petition Date, Commerce Bank had determined to commence a foreclosure proceeding to recover its collateral.[1] Bank counsel stated that Commerce Bank was persuaded to forbear because it began to see some improved management of the hospital, a concomitant improved flow of financial information, and the Debtor made a compelling argument regarding the need to supply

---

[1] Commerce Bank was both the indenture trustee and holder of bonds issued by the New Jersey Healthcare Finance Facility Authority ("NJHCFFA") in the approximate amount of $22 million, secured by a lien on substantially all of the Debtor's assets.

health services to the Passaic community.  However, counsel indicated that Commerce Bank was

forbearing reluctantly, and warned that the Debtor's operations could not be sustained for long

solely by the use of its cash collateral.

The events described above provide the background for assessing the sale process and the

bids proffered by BIRAC and St. Mary's.  Likewise, these facts demonstrate that a sale or other

transaction had to be accomplished within a rather compressed time frame.


B.    **The BIRAC APA**

The Debtor, together with Cain Brothers, implemented a sale process for all or substantially

all of its assets.  (BIRAC Sale Motion [Docket 364], ¶ 25).  Beginning in July, 2006, Cain Brothers

contacted over 100 potential buyers, including for-profit entities and non-profit entities (both local

and national).  (Id. at ¶ 27).  Ten parties signed confidentiality agreements and were granted access

to an electronic data room created by the Debtor. (Id.).  The Debtor provided potential bidders

access to its books and records, as well as its facilities. (Id. at ¶ 26).  Also to facilitate the sale

process, the Debtor made a copy of a model asset purchase agreement available in the electronic data

room. (Gline Cert., ¶ 33).  As a result of these marketing efforts, on September 12, 2006 the Debtor

received three non-binding bids, including a bid of approximately $25 million from BIRAC and a

bid of approximately $22 million from St. Mary's. (Gline Cert., ¶ 12).   BIRAC points out that its

bid expressly included a stalking horse provision, which stated that "[t]he stalking horse designation

is material to our bid and essential for our continued interest in the transaction." (BIRAC Motion

for Allowance of Administrative Claim, Ex. A).

On September 13th, one day after the bids were received, Thomas Barry ("Barry") of Cain

Brothers, and Michael Sirota ("Sirota"), Debtor's counsel, engaged in an email discussion regarding

the bids.  Sirota states that "[u]pon review of the two bids, it would appear to me that the only way

to get St. Mary's and the State (and any other interested party) genuinely focused is to drive the deal

with Bergen Regional ("BIRAC") and try and get them signed up as a stalking horse." (Mervis

Decl., Ex. D.).  Barry responded that "[i]f the State is going to be active this is about the time that

activism will be productive.  St. Mary's needs to lead the charge with the Governor's office and with

DOH ("Dept. Of Health")." (Id.).  This exchange is cited by BIRAC in support of its contention that

it was the de facto stalking horse for the Debtor's asset sale.  However, when placed in the context

of the discussion set forth below, it appears to the Court that this discussion is better characterized

as strategizing, based on the fact that BIRAC had submitted a bid with the highest dollar value.

Approximately two weeks after the Barry/Sirota email exchange, on September 26, 2006,

Gerald Gline ("Gline") emailed various of the Debtor's professionals to inform them that the

adjourned cash collateral hearing was likely to be further adjourned to October 11, 2006. (Mervis

Decl., Ex. E).  He also suggests the witnesses that should testify for the Debtor in the event of a

contested hearing, and states that, "Hopefully between now and then the bids will improve and

Commerce will fall in line." (Id.) The very next day Barry replied to Gline's email itemizing the

points of his discussion with Victor Slaiciunas ("Slaiciunas"), a Vice President of Commerce Bank.

Barry informed Slaiciunas, inter alia, that (i) three bidders are "still in the running"; (ii) "St. Mary's

is a weak bidder and should not be considered viable," but that the Debtor wants to keep the St.

Mary's bid "extant" and wants St. Mary's to ask the New Jersey Department of Health for the $30

million it believes is needed; (iii) some negotiations remain on the Doctors' bid; (iv) an agreement

is near with BIRAC; and (v) if none of the bids meet the Debtor's minimum requirements, the

Debtor will consider a bid that will keep the hospital independent. (Id.)

Efforts to structure a sale continued unabated as September gave way to October.  The month

of October, 2006 was dominated by the Debtor's negotiations with BIRAC over the terms of an asset

purchase agreement, St. Mary's efforts to obtain financing for a renewed bid, and Commerce Bank's

insistence that as a condition for use of its cash collateral and its agreement to extend debtor-in-possession financing ("DIP Facility"), the Debtor must demonstrate that the sale transaction could successfully close.

The Debtor had hoped to reach a final agreement with BIRAC by the second week in October. (Gline Cert., ¶ 13 and Ex. E.). It appears that part of the delay occurred as a result of exchanging multiple drafts of an asset purchase agreement between the parties. Nonetheless, the parties expected to execute the BIRAC APA on or about October 19, 2006. (Gline Cert., Exs. F&G). However, a dispute arose between the Debtor and BIRAC regarding certain residential real property that BIRAC wanted to include as part of the transaction. (Gline Cert., ¶ 16 & 17); Richard Zall ("Zall") Suppl. Cert., ¶ 6 - 9). The dispute was finally resolved by including the residential real property and raising the purchase price. (Gline Cert. ¶ 17). As a consequence, execution of the BIRAC APA did not occur until October 25, 2006 (BIRAC Motion for Allowance of Administrative Claim ("BIRAC Motion"), Ex. A). Gline opined to Barry that closing the BIRAC APA or transaction would be difficult, but agreed that a "bad deal is better than no deal" and expressed the hope that a signed deal would yield an improved deal. (Mervis Decl., Ex. M).

However, it does not appear that the BIRAC APA was completely negotiated to BIRAC's liking. Following execution of the BIRAC APA, BIRAC insisted that the agreement be further amended to grant BIRAC the ability to withdraw from the sale in the event that BIRAC did not receive confirmation from state regulatory authorities that partial ownership of BIRAC by physicians who make patient referrals to the hospital would be permitted by state law, including N.J.S.A. § 45:9-22.5, et seq. (The "Codey Law"). (Gline Cert. ¶ 21). According to Gline, this amendment was not agreed upon until October 31, 2006, and only then was the bid deposit made by BIRAC. (Id.)

The following day (November 1st), the Debtor filed its motion for (i) approval of the sale

of substantially all of the Debtor's assets and assumption of related executory contracts, (ii) authorization of a stalking horse agreement with BIRAC, and (iii) scheduling an auction sale, and (iv) approval of the form, manner and sufficiency of notice.  By order dated November 2, 2006, the Court authorized a hearing date of November 9, 2006.  However, as recounted below, no hearing was held on that date, or on the adjourned hearing dates of November 10, 2006 or November 13, 2006.  By November 13th, it was revealed that the Debtor had reached an agreement with St. Mary's and would not request the Court's approval of the BIRAC APA.

### St. Mary's Renewed Bid

While the negotiations over the terms of the BIRAC APA were taking place, St. Mary's continued its efforts to obtain financial assistance from the State of New Jersey.  It must be noted that the Debtor and St. Mary's had been exploring consolidation of their facilities for at least a year prior to the Chapter 11 filing by the Debtor.  (Ziemann Cert., ¶ 2).  As Wayne Zeimann, a partner in J.H. Cohn, LLP ("Ziemann") explained, "the changes in healthcare delivery, shorter length of stay, managed care and the like created a situation where there were too many hospital beds in Passaic, and duplication of services resulting in both [the Debtor] and St. Mary's losing money." Id. "Indeed, even prior to PBI's Chapter 11 filing, St. Mary's had set up a task force of certain of its board members and officers to explore means for St. Mary's to acquire PBI and integrate the two hospitals at the PBI campus." (Id.)  Mario Marghella ("Marghella"), the Chairman of the Board of Trustees of the Debtor confirms that discussions regarding consolidation of the Debtor with St. Mary's occurred in early 2006.  (Marghella Cert., ¶ 2).  These discussions were also continued in August, 2006 (Id.)  Ziemann  further states that when St. Mary's submitted its bid in September, 2006, it was not aware of the identities of the other bidders or the terms of their offers.  (Ziemann Cert., ¶ 7).  Ziemann also states that independent of the efforts of the other bidders, St. Mary's

continued with its own bid effort because it had a longstanding interest in consolidating with the Debtor, and the obstacle was financing the transaction. (Id.).

Nonetheless, in early October, 2006, the Debtor's professionals were decidedly pessimistic about St. Mary's prospects. On October 4, 2006, Barry emailed Gline and others to inform them that Commerce Bank was negative about a St. Mary's deal. (Mervis Decl., Ex. F). Barry noted that St. Mary's had a meeting scheduled with Governor Corzine for October 16th, but expressed his belief that it was "way too late to be helpful to our case." Id.

However, it also appears to the Court that the Debtor did not completely discount St. Mary's as a possible purchaser. The Debtor had scheduled a meeting for October 5, 2006, with Dr. Fred Jacobs, the Commissioner of Health and Senior Services, and various other representatives from State agencies, including representatives from the NJHCFFA. (Gline Cert., ¶ 34). Ziemann was invited to the meeting to make a presentation regarding a St. Mary's proposal. (Id.)[2]    About two weeks later, on October 17, 2006, Gline informed  Barry and Sirota that counsel for St. Mary's advised him that the meeting with the Governor's staff was very encouraging, and that they were receptive to St. Mary's requests. (Mervis Decl., Ex. I).[3]  Thereafter, on October 20, 2006, in furtherance of its bid effort,  St. Mary's sent more detailed information to the Governor's staff and the Department of Health and Senior Services regarding acquisition of the Debtor. (Ziemann Cert., ¶ 9 and Ex. A). A week later, on Friday, October 27, 2007, Karen Gilman ("Gilman"), counsel for St. Mary's called Gline to schedule a meeting to discuss a renewed bid by St. Mary's. (Gline Cert.,

---

[2]After Ziemann made the St. Mary's presentation he did not participate in the Debtor's status report to Commissioner Jacobs.  (Gline Cert., ¶ 34).

[3]However, Sirota was not disposed to delay moving forward with BIRAC.  He replied to Gline that the BIRAC APA should be filed, "and St. Mary's can play catch-up." (Mervis Decl., Ex. J).

¶ 35).

The Debtor agreed to schedule a meeting with St. Mary's for October 30, 2006.   (Gline Cert., ¶ 35).  However, the Debtor's professionals had not abandoned their efforts to move a sale motion premised on the BIRAC APA.  An email exchange between Gline and Barry on October 28, 2007 reveals that Barry, in particular, thought it important to finalize the terms of an asset purchase agreement with BIRAC before considering an offer from St. Mary's.  (Mervis Decl. Ex. O).  Gline was less sanguine that the BIRAC APA could be completed.  He expressed to Barry his concern that counsel for Commerce Bank "is going to ask for too many changes, most of which are not significant but given how [BIRAC] acts, will take more time to resolve." (Id.).  Gline further opined that "I think we improve our chances if we have this meeting with St. Mary's so the State knows we are continuing to move that deal while we try to get [BIRAC] shored up." (Id.)

The Debtor met with St. Mary's on October 30, 2006 (Gline Cert. ¶ 35).  At that meeting the Debtor was informed that the State of New Jersey had agreed to provide funding for a bid by St. Mary's.  The details of the proposed financing and the St. Mary's bid were also discussed with the Debtor.  (Id.).  On November 1st and 2nd,  the financial consultants for the Debtor and St. Mary's were immersed in reviewing the financial requirements and the capital structure of a St. Mary's bid. (Mervis Decl., Exs. R and S).  Likewise, by November 3, 2006, the Board of Trustees for each hospital endorsed the acquisition of the Debtor by St. Mary's.  (Mervis Decl. Exs. U and V).  Gline states that the St. Mary's renewed bid was incorporated into an asset purchase agreement that was merely a revision of the submission initially made by St. Mary's on September 12, 2006.  (Gline Cert. ¶ 33).

**<u>Commerce Bank's Requirement for Use of Cash Collateral and DIP Facility</u>**

The backdrop to the Debtor's negotiations with both BIRAC and St. Mary's was the Debtor's knowledge that it had insufficient funds to continue operations beyond November, 2006, and that Commerce Bank would not provide financing unless the Debtor had a contract of sale for the hospital. Slaiciunas, the Commerce Bank loan officer certified that:

> During this bankruptcy proceeding the Debtor requested that Commerce loan it additional funds to allow it to continue operating pending a closing. Commerce continually responded that there first had to be a contract of sale, which in Commerce's opinion had more than a reasonable probability of closing, and also that the Debtor's revenues in conjunction with any proposed additional loan from Commerce would be sufficient to keep the Debtor open until the expected date of closing.

(Slaiciunas Cert., ¶ 2).

In keeping with the concerns it expressed at the initial hearing on the use of cash collateral, Commerce Bank only agreed to permit continued use of its cash collateral at monthly intervals, and subject to budget projections from the Debtor that Commerce Bank found reasonable. The order authorizing the use of cash collateral for August, 2006 was signed by the Court on August 24, 2006, and the order authorizing use of cash collateral for the month of September, 2006 was signed on September 7, 2006. Agreement on the use of cash collateral for the month of October, 2006 was not as readily reached. The October 3, 2006 hearing date was adjourned to October 10, 2006, then to October 11, 2006, and finally to October 19, 2006 so that Commerce Bank and the Debtor could attempt to reach terms for the consensual use of cash collateral.

It was not to be. On October 17, 2006, Commerce filed an objection to the Debtor's application for the continued use of the bank's cash collateral. Commerce noted that the budget appended to the Debtor's application revealed that on an operating basis the Debtor's net cash flow

for October 2006 was negative $108,000.00.  (Commerce Bank Objection, ¶ 8 [Docket # 315]).

Commerce Bank further noted that on projected total collections of approximately $10,210,000.00

for October, 2006, the month end projection cash balance was estimated at $460,000.00, leaving

little room for error. (Id.)

More pointedly, Commerce Bank's objection assessed the Debtor's future in rather bleak

terms:

> The Debtor has managed to satisfy its post-petition obligations only
> because it has borrowed against its future, i.e., receiving the full
> yearly advance of $3,400,000 in state charity care in only the first
> three (3) months of the year.  There is no more extraordinary source
> of funds to satisfy the negative cash flow of approximately
> $1,000,000 per month.   With three (3) payroll periods in November
> and without anymore entitlement to charity care subsidies, it is
> anticipated that the Debtor will shortly have insufficient funds and
> cash flow to support its operations.  Efforts to sell all of its assets,
> both pre-and post-petition, have failed to generate an offer that
> supports continuing a reorganization effort.    The Budget
> accompanying the present Application fails to take into account or
> address the impending financial failure.  Thus, it should be rejected
> by the Court and use of cash collateral as requested should be denied.

(Id., ¶ 12).

Commerce Bank bluntly contended that rather than use its available cash for ongoing operations

pending a sale, the Debtor should plan for an orderly closure with its remaining funds. (Id. ¶ 19).

There is no question that the Debtor used the prospect of an agreement with BIRAC as a

reason for Commerce Bank to continue to permit the use of cash collateral.  In early October, 2006

Gline as counsel for the Debtor, emailed Joseph Lubertazzi ("Lubertazzi"), counsel for Commerce

Bank, suggesting that it would be better to work on finalizing the BIRAC APA rather than engage

in a contested hearing for the use of cash collateral, and requested that the cash collateral hearing

be carried for a couple of weeks.  (Mervis Supp. Decl., Exs. 1 & 2).  Additionally, to encourage

Commerce Bank to agree to adjourn the October 11th hearing to October 19th, Barry  of Cain

Brothers promised to give Commerce Bank a copy of the draft BIRAC APA when it was received

from BIRAC.  (Mervis Decl., Ex. H).  Gline also sought help from St. Mary's to induce Commerce

Bank to agree to the Debtor's continued use of cash collateral.  In an October 17, 2006 email Gline

tells Barry, Sirota, and others that he was informed that the St. Mary's meeting with the Governor's

staff was encouraging.  He further states:

> I told Karen [Gilman] and Bernie [Katz] we were close to final
> documentation of stalking horse agreement and filing for bid
> procedures order. I also told them we have a contested cash collateral
> hearing, Joe filed his objection and that I thought it would be helpful
> for them to file a reply with the court that brings the court up to speed
> on their discussion with the state and the prospects that the state will
> provide them with financial support and they would then be a bidder.

(Mervis Decl., Ex. I).

Ultimately, and at the last moment, Commerce Bank relented.   I t is not clear from the

record what caused Commerce Bank to change its mind, but on the October 19, 2006 hearing date,

Debtor's counsel informed the Court that Commerce Bank agreed to extend use of its cash collateral

up to October 31, 2006.  An order authorizing the use of cash collateral for the period October 1-31,

2006 was signed by the Court on October 20, 2006.  The order also required the Debtor to file an

application for the further use of cash collateral by October 30, 2006, and scheduled a hearing on

the application for November 6, 2006.

At the end of October, 2006, the Debtor's financial condition remained dire and Commerce

Bank was still resistant to providing a DIP Facility. The Debtor's struggle to craft a solution

acceptable to Commerce Bank was evidenced by the October 29, 2006 email from Gline to counsel

for Commerce Bank, and copied to the Debtor's other professionals:

13

We will seriously consider whatever firm proposal your client makes. In terms of the funding from the state, they have thus far given us all the charity care that has been allocated for the year. Herb has kept the commissioner's office fully abreast of our circumstances. He and or I will bring them up to speed and make sure they understand the short and slightly longer term financial condition of cash flow needs of the hospital Monday morning.

Waite has been very up-front with Commerce regarding the cash flow needs. I am by copy of this email asking him to speak to me about impact of 2 million from Commerce. Timing is everything. Are we talking about right
 now?!!!!

State is highly motivated to keep PBI open. After I speak with Herb, it may make sense for us to develop a coordinated plan, and include DeCotis but any approach to the state has to at this point involve a commitment from Commerce - not if state or someone else does thus and such Commerce will consider doing something. I appreciate that you are trying hard to put something together that can work. However, every conversation and email from you follows the same pattern. You ask whether the state, professionals, buyer can absolutely commit to something and end by saying if everyone else absolutely does xy or z your client may do something. We or the state agree to do what you ask. We do it and then you tell us Commerce cannot do what you said they might do. I am reluctant to ask the buyer whether they will put up five hundred thousand subordinate loan. Based upon the discussion you and I had with Zall, I would not be optimistic.

Bank's view is buyer should do more. Buyer's view is they are committed to a deal which put enough money on table to pay your client nearly all they are owed and they are perplexed that bank will not fund a dip. I think that if they will do anything along the lines you are requesting, they need to know Commerce is absolutely committed to making a dip. Tom Barry if you think we should speak to Rick now to make this request call me and I will make that request with you.

We have consistently told you and your client we need 2.5 million dip to get to Dec and need it in November. (November is Now) Because of delays in getting to a stalking horse deal done (though no ones fault). The amount through January has increased. We will work very hard to try and cover the increased hole. But don't make that job more difficult by backing off from what has always been the understanding, from day one, that we need 2.5 dip.

I do appreciate your personal efforts to make this happen. If you think a conference call or meeting today, tonight or tomorrow morning would be helpful, let me know and I will try set it up.

14

(Mervis Suppl. Decl., Ex. Z.)

The situation evidenced by the foregoing email did not improve by October 31, 2006.  An email exchange among the Debtor's counsel, financial consultants and counsel for Commerce Bank reveals that terms on a DIP Facility had not been reached.  The portion of the email exchange that is comprised of Gline's email to counsel for Commerce Bank evidences Commerce Bank's requirements for a DIP Facility and its familiarity with the BIRAC bid and  St. Mary's evolving offer.  Gline writes:

> At the point we left off this morning, Mike and I understood that Commerce might be prepared to provide a DIP of somewhere between $1.5 and $2 million.  Characteristic of all our discussions, there were demands made by Commerce and strings attached but no commitment on Commerce's part to do anything.  But it seemed clear at that point that there was some level of additional risk tolerance on Commerce's part ($1.5 to $2 million) subject to conditions, which I asked you to provide to me in a comprehensive list.  We already told you that at that point we did not believe the state would come up with $500k (one of your conditions) and that a $500k loan from the Buyer [BIRAC] (another condition) was a non starter, but that we thought their commitment to the deal was evidenced by the considerable fees they had already expended and would continue to expend.  By the way the $750k deposit has been posted.  I did tell you we were working on another source of $500k which would not be a loan.  We think that will happen.
>
> Late this afternoon I heard both from you and Mark Hopkins that the governors office and treasury were considering a structure of supports through the hospital finance authority for a combined St. Mary's PBI deal.  We had a meeting yesterday with St. Mary's where they also outlined that type of a deal.  I also heard from Mark Hopkins that as part of this package there was serious consideration being given to support for an immediate DIP loan (I assume a guaranty of some sort) which would enable Commerce to make that loan.  Both Mark Hopkins and the Commissioners office understand that if we don't have a dip in place tomorrow by five PM we are advising the board we must close.

(Mervis Suppl. Decl., Ex. 4).

When no DIP Facility was forthcoming, on November 2, 2006, as a prelude to closure, the Commissioner of Health ordered the Debtor to close its emergency room and cancel certain surgical procedures. (Gline Cert., ¶ 30).

It appears that Commerce Bank's refusal to consent to further use of its cash collateral or to fund a DIP Facility in part resulted from an October 25, 2006 meeting with BIRAC regarding the terms of BIRAC's acquisition of the Debtor.  Mark Mueller, the managing member of BIRAC, thought that the meeting went well and that all of Commerce Bank's questions and concerns were satisfied .  (Mueller Decl., ¶ 9-13).

However, Mueller's assessment of the meeting was not shared by Commerce Bank. Commerce Bank was concerned that various provisions of the BIRAC APA either gave BIRAC the ability to rescind the sale entirely, or materially alter the purchase price.  (Gline Cert., Ex. L). Moreover, the bank was concerned that the necessary regulatory approvals could not be obtained until January - February, 2007, and the Debtor's latest cash flow statement demonstrated that the Debtor could run out of cash in early November, 2006. (Id.) Slaiciunas states flatly that "[a]fter such discussions Commerce was not comfortable that the proposed contract with BIRAC had a reasonable possibility of closing before the Debtor ran out of funds.  Commerce therefore advised the Debtor that it would not provide DIP financing." (Slaiciunas Cert., ¶ 3).[4]

At the same time that Commerce Bank informed the Debtor that it would not provide financing for a BIRAC transaction, it indicated that the bank would entertain financing for a St. Mary's bid if it could verify that the State of New Jersey had agreed to fund a St. Mary's bid through

_____

[4]If a sale could not close until January - February, 2007, the Debtor's need for financing was projected to approximate $5 million. (Gline Cert., ¶ 28).

the issuance of bonds by NJHCFFA. (Gline Cert., ¶ 36).  The negotiations by the Debtor with St.

Mary's and Commerce Bank consumed much of early November, 2006, and a final agreement on

a DIP Facility was not actually reached until the morning of November 13, 2006, when the Debtor

made an oral motion for approval of the DIP Facility and the use of cash collateral. (Id.)

The DIP Facility that was cobbled together illustrates how narrowly the Debtor escaped from

closure and liquidation.  Gline describes the agreement as follows:

> The DIP loan included a $2.5 million advance from Commerce, with
> the use of $500,000 of the deposit from the sale contract with St.
> Mary's and $500,000 from doctors, board members and concerned
> citizens.  NJHCFFA also advanced $1.5 million towards the DIP
> Financing.  Commerce agreed to allow the entire $5 million DIP loan
> to prime its existing liens.  The amount of the DIP Financing had
> grown from $2.5 million (the amount initially estimated to be needed
> at the outset of the Chapter 11 Case) to $5 million because it was now
> clear that the likely targeted date for a closing would be February 28,
> 2007 (and $5 million was the projected operating cash shortfall
> through that date).  Commerce imposed a number of conditions to its
> agreement to the DIP Financing, and incorporated these conditions
> in the DIP order.  Primary among these was that the Debtor pursue a
> sale transaction with St. Mary's not BIRAC.

(Gline Cert., ¶ 30).

In fact, at the hearing on November 13, 2006 on the Debtor's motion for approval of the DIP

Facility, the Court queried Debtor's counsel about the linkage between the DIP Facility and the St.

Mary's offer.  Gline replied:

> [Y]ou're right your Honor, there is clear linkage between this DIP
> financing and the St. Mary's deal because it's the only terms and
> conditions under which Commerce has agreed to lend to us.  They
> flat out refused to lend to us on the Mueller {BIRAC} deal, plus there
> is no other source of funding, you know, from the state or anyone else
> to complete the DIP at the $5 million number that we need under that
> deal... So, I think where we essentially are is that, you know, we are
> either going to get to a transaction with St. Mary's or we're going to
> close this hospital.

17

Transcript of 11/13/06 Hearing, at p. 26, line 24 through p. 27, line 5; p. 28, lines 7-9.

Once the Debtor had arranged financing and entered into an asset purchase agreement with St. Mary's ("St. Mary's APA") matters moved swiftly.  On November 14, 2006, the Debtor filed its motion to set procedures for a sale of substantially all of its assets to St. Mary's.  At a hearing on November 21, 2006 the Court approved the sales procedures, approved St. Mary's as a stalking horse, and scheduled a hearing for approval of the sale on December 11, 2006.  Notably, although St. Mary's requested approval of a break-up fee in the amount of $1,050,000 (3% of the purchase price) the Court declined to approve the fee.  Rather, the ability of St. Mary's to apply for a Break-up fee was preserved.  No other qualifying bids were received, and on December 11, 2006, the Court approval the sale to St. Mary's.  The sale closed on February 28, 2007.

## **DISCUSSION**

Asset sales conducted outside the ordinary cause of business and prior to a plan of reorganization have occurred so frequently in the last several years that they have become a commonplace feature of reorganization under title 11 of the Bankruptcy Code.  Likewise, it has become a widespread practice for the prospective purchaser, as the initial bidder, to seek designation as the stalking horse, and to insist on a break-up fee provision in the asset purchase agreement, and as part of the sale bidding procedures.  The purpose of the break-up fee is to provide compensation or reimbursement in the event that the prospective purchaser (stalking horse) is not the winning bidder.

Here, the BIRAC APA executed by both BIRAC and the Debtor contained a break-up fee provision.  However, the BIRAC APA was never presented to the Court.  Rather, the Debtor withdrew its sale motion premised on the BIRAC APA, and instead presented to the Court a sale

18

motion premised on an asset purchase agreement with St. Mary's Hospital.  Nonetheless, BIRAC

contends that it is entitled to a break-up fee because (i) as a stalking horse it was the catalyst for the

St. Mary's bid, (ii) BIRAC's emergence as the initial highest offeror helped secure Commerce

Bank's continued support for the sale process, and (iii) the Debtor agreed to a break-up fee

provision.

 The standards for evaluating break-up fees have varied.  Some courts have adopted the

business judgment rule applied by courts in non-bankruptcy matters.  See, e.g., In re Integrated

Resources, Inc., 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), aff'd In re Integrated Resources, Inc.,

147 B.R. 650, 657 (S.D.N.Y. 1992).  In contrast, the court in In re America West Airlines, Inc., 166

B.R. 908, 912 (Bankr. D. Ariz. 1994) stated that "the standard is not whether a breakup fee is within

the business judgment of the debtor, but whether the transaction will 'further the diverse interests

of the debtor, creditors and equity holders, alike'".  The Third Circuit Court of Appeals was not

persuaded that either approach was appropriate.  The Third Circuit concluded that "the

determination whether break-up fees or expenses are allowable under § 503(b) must be made in

reference to general administrative expenses jurisprudence.  In other words, the allowability of break

-up fees, .... depends upon the requesting party's ability to show that the fees were actually necessary

to preserve the value of the estate."  In re O'Brien Environmental Energy, Inc., 181 F.3d 527, 535

(3d Cir. 1999).

 In the O'Brien case, Calpine Corp. ("Calpine") entered into an asset purchase agreement with

the Debtor under which Calpine's performance obligations were conditioned on the Bankruptcy

Court's approval of a $2 million break-up fee and expenses of $2 million.  181 F.3d at 529.

Concerned that the break-up fee might chill the bidding, the Bankruptcy Court declined to approve

the break-up fee and expense provisions. Id.  Calpine at first indicated that it would not go forward

19

with its offer without the buyer protections that it had requested. Id. However, Calpine later rejoined the bidding process, and the Bankruptcy Court's order approving a modified Calpine contract expressly reserved Calpine's right to request a break-up fee and expenses. Id. at 530. Calpine was outbid and thereafter filed its request for the break-up fee and expenses, which the Bankruptcy Court denied. Id.

In affirming the District Court and the Bankruptcy Court, the Third Circuit reviewed the evidentiary record to determine whether it supported "the Bankruptcy Court's implicit conclusion that awarding Calpine break-up fees was not necessary to preserve the value of O'Brien's estate. Id. at 537. It agreed with the Bankruptcy Court that the relevant inquiry was whether Calpine demonstrated that its bid was the catalyst for higher offers, and that Calpine had not met its burden. Id. Further, the Third Circuit pointed out that the record revealed that O'Brien, rather than Calpine assembled much of due diligence data on which Calpine and others relied to bid. Thus, Calpine's contention that its research efforts helped establish information on which others could rely, was unfounded. Id. Using the guidance provided by O'Brien, it is manifest that BIRAC's request for payment of a break-up fee cannot be granted. The factual record before the Court does not establish that the efforts expended by BIRAC were necessary to preserve the value of the Debtor's assets.

The facts do not reveal that the BIRAC bid for the Debtor's assets was a catalyst for the St. Mary's bid. The uncontradicted record reveals that St. Mary's was interested in acquiring or merging with the Debtor approximately a year prior to the filing of the Debtor's Chapter 11 case. Both Ziemann and Marghella certified that the Debtor and St. Mary's had discussions regarding consolidating the two hospitals on the Debtor's campus both before and after the Chapter 11 case was filed. As Ziemann observed, the financial realities of operating a non-profit healthcare facility in Passaic, New Jersey were what motivated St. Mary's to pursue acquisition of the Debtor. It

20

further appears to the Court that after September, 2006, St. Mary's obstacle to submitting a higher bid was financing a bid, and that obstacle was only surmounted when the State of New Jersey, through NJHCFFA, provided financial assistance. This financial commitment from the State of New Jersey did not occur until late October, 2006. The facts detailed earlier in this opinion demonstrate that St. Mary's never ceased its pursuit of a transaction with the Debtor. There is no evidence that the BIRAC offer caused St. Mary's to exert greater effort.

BIRAC makes much of speculation by Debtor's counsel that an executed BIRAC APA would spur St. Mary's to produce a competing offer. No doubt counsel and others were hopeful that the BIRAC APA would be a stimulus to others. However, such speculation is not evidentiary with regard to St. Mary's intentions and the record before the Court evidences that St. Mary's continued efforts to acquire the Debtor's hospital was grounded in the financial benefit to St. Mary's from consolidation. Further, the fact that the St. Mary's renewed bid was put together at or about the same time as BIRAC was finalizing its agreement with the Debtors appears to be attributable to the time that it took for St. Mary's to obtain financial assistance from the State of New Jersey and the fact that BIRAC's negotiations with the Debtor did not conclude earlier.

Further, it appears to the Court that the Debtor went forward with a sale motion premised on the St. Mary's APA rather than the BIRAC APA because Commerce Bank would not support a sale to BIRAC and would not provide a DIP Facility to fund the Debtor's operations pending a closing on a sale to BIRAC. In short, while clearly BIRAC and St. Mary's can be said to have been competing offerors, there are no facts that support the contention that BIRAC's efforts caused St. Mary's to join the sale process.

Nor can it be said that BIRAC's research and due diligence efforts produced data on which others relied. The Debtor and Cain Brothers created a sale process in which over 100 potential

purchasers were contacted.  The Debtor created an electronic data room and posted a model asset

purchase agreement for use by interested parties.  Thus, the work to prepare the Debtor for sale was

largely done by the Debtor's professionals.  In this regard the matter at hand is distinguishable from

In re Tropea, 352 B.R. 766 (Bankr. N.D. W. Va. 2006); and In re Dorado Marine, Inc., 332 B.R. 637

(Bankr. M.D. Fla. 2005), relied upon by BIRAC.

In Tropea, the debtor executed a purchase agreement with David Mezzenotte ("Mezzenote").

Pending a hearing on the debtor's request to approve a sale, Mezzenote advanced funds to satisfy

outstanding real property taxes and thereby precluded a tax sale. 352 B.R. at 767.  The payment of

taxes also prevented relief from stay being granted to the mortgagee.  At the sale hearing a higher

offer from another party was accepted.  Id.  Thereafter, Mezzanote requested a "finder's fee" of

$3,000 on the basis that his actions stopped both the tax sale and the mortgagee's effort to foreclose,

and caused additional value to be paid for the debtor's assets.  Id.  The Court agreed that

Mezzanote's actions had preserved and increased the value of the estate.  Though it declined to

award him a "finder's fee," it concluded  that he was entitled to recover his actual and necessary

costs and expenses.  Id. at 768-69.

In the matter *sub judice*, BIRAC argues that similarly, its presence as the bidder with whom

the Debtor was negotiating an asset purchase agreement induced Commerce Bank to continue to

extend cash collateral, and thereby the debtor's assets were preserved pending the sale to St. Mary's.

However, the facts do not support BIRAC's contention.  Commerce Bank was supportive of a sale

process from the onset, and urged the Debtor to act as quickly as possible.  However, Commerce

Bank's support for sale of the Debtor's hospital was at all times conditioned upon a transaction

acceptable to it and a closing on the sale before the Debtor ran out of cash to fund its operations.

The fact that in early November, 2006, it refused to extend a DIP Facility and the Commissioner of

Health began shutdown procedures plainly shows that Commerce Bank did not consider offers for the Debtor's assets to be sufficient. Commerce Bank ultimately supported a sale to St. Mary's and refused to support a sale motion premised on the BIRAC APA because it was not convinced that a transaction with BIRAC would be consummated.

Dorado Marine is also inapposite. The debtor, Dorado Marine, had been in the business of building custom boats. When the trustee took possession of the debtor's assets a number of boats were under construction and lacked hull numbers. 332 B.R. at 638. Thereafter, HK Acquisitions, Inc. ("HKAI") advised the trustee of its interest in acquiring the debtor's assets and performed all the due diligence necessary to ready the assets for sale. Id. at 639. HKAI subsequently entered into a contract with the Chapter 7 trustee to purchase substantially all of the debtor's assets. Among the contractual provisions was one for a break-up fee of $50,000 in the event HKAI was not the successful bidder. Id. HKAI was not the successful bidder and the court applied the reasoning of O'Brien to determine whether HKAI was entitled to any recovery. Id. at 640-41. The court found that "the efforts of HKAI placed the assets of the Debtor in a posture such that other bids were attracted." Id. at 640. It also found that HKAI was a catalyst for higher bids: "[t]he eventual highest and best bid exceeded HKAI's bid by the minimum amount required by the sale provisions, and was made contingent upon HKAI remaining in the bidding, and so clearly relied upon HKAI's valuation and efforts." Id. at 641. Again, the facts before this court are not comparable. The Debtor's professionals prepared the due diligence materials, and even supplied a model asset purchase agreement. Thus, there were no services performed by BIRAC that preserved assets of the Debtor's estate.

Equally unpersuasive is BIRAC's argument that the Court should view the break-up fee provision in the BIRAC APA as a liquidated damages clause. It emphasizes that the Debtor not only

23

agreed to the break-up fee, but also advised the Court that the break-up fee requested was reasonable and appropriate. It argues that when the Debtor withdrew the sale motion premised on the BIRAC APA, it breached its obligation to BIRAC to seek Court approval of the sale to BIRAC and the break-up fee. BIRAC contends that the Debtor must be held to its contractual obligations, because to do otherwise would encourage parties to play fast and loose with the courts.

BIRAC's argument that a Debtor should be held to its contractual obligations is true as a general proposition, but irrelevant to the matter before the Court. Allowance of a break-up fee is not simply a matter of contract. Since the O'Brien decision was rendered in 1999, it has been well known that in this Circuit that allowance of break-up fees must be determined by the same standard applied to the allowance of any administrative expense. That is, break-up fees may be allowed when it is shown that the fees are actually necessary to preserve the value of the estate assets. O'Brien, 181 F.3d at 535. The fact that the Debtor agreed to the break-up fee and thought that it was reasonable and appropriate is not determinative of the allowance of such a fee as an administrative expense. The Third Circuit did note that the Court can assess the considerations that underlie a debtor's business judgment, but it nonetheless concluded that with regard to allowance of a break-up fee, the Court need not defer to the debtor's exercise of its business judgment. Id.

Moreover, this Court does not find the BIRAC APA to be binding on the Debtor. Section § 7.2 of the BIRAC APA expressly provided that it was subject to the approval of the bankruptcy court. Obviously, because the Debtor's motion premised on the BIRAC APA was withdrawn, there was no such approval. It is indisputable that in negotiations involving an out of the ordinary course transaction, a debtor-in-possession may agree to terms that are not beneficial to its creditors. This may occur, for example, because the bargaining position of the debtor-in-possession is weak, or it places its interest ahead of those of its creditors. The requirement of notice and hearing and court

24

approval for transactions that are out of the ordinary course of business, such as sales conducted

under § 363(b)(1), is an obvious safeguard imposed to insure that such transactions actually benefit

the estate rather than just one or more of the parties to the transaction.

This Court agrees with the analysis by Judge Bernstein in <u>In re Asia Global Crossing, Ltd.</u>,

326 B.R. 240, 256 (Bankr. S.D.N.Y. on re hg., adhered to at 332 B.R. 5206 Bankr. S.D.N.Y 2005):

> The proposed transaction fell outside of Asia Global's ordinary
> course of business, and required Court approval.  <u>See</u> 11 U.S.C. §
> 363(b)(1).  Asia Global was not, therefore, bound to perform the
> ANC Sale contract until Court approval.  Prior to approval, Asia
> Global could withdraw the application and abandon the contract, or
> the terms of the sale contract could change.

Accordingly, BIRAC's argument that it is contractually entitled to a break-up fee fails.


## <u>CONCLUSION</u>

BIRAC's request for a break-up fee must be considered on the basis of whether the fee was

actually necessary to preserve the assets of the Debtor's estate.  The factual record does not support

BIRAC's position that the Debtor used BIRAC as a catalyst for a bid from St. Mary's or that the

BIRAC offer induced Commerce Bank to agree to the Debtor's continued use of its cash collateral.

Nor does this Court find that BIRAC is entitled to the break-up fee as liquidated damages.

Accordingly, BIRAC's request for allowance and payment of a break-up fee as an administrative

expense is denied.